

POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

In re

ROBERT RATHBURN and
SHIRLEY RATHBURN,

                    Debtor.
_____/

Case No. 05-19213-A-13
DC Nos. PBB-3 and RLF-5

FINDINGS OF FACT AND
CONCLUSIONS OF LAW REGARDING
CONFIRMATION OF THIRD
AMENDED PLAN AND OBJECTION
TO CLAIMED HOMESTEAD
EXEMPTION

     A hearing was held November 9, 2006, on confirmation of the third amended plan proposed by Robert Rathburn and Shirley Rathburn.[1]  Following the hearing, the court took the matter under submission.  This memorandum contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52.  This is a core proceeding as defined in 28 U.S.C. §157(b)(2)(A), (L), and (O).

     Mr. and Mrs. Rathburn filed their chapter 13 case on October 11, 2005.  The plan which they asked the court to confirm at the November 9th hearing was their third amended plan.  The court had

---

     [1]The hearing was also calendared as an objection to the debtors' claim of homestead exemption.  However, as will be discussed herein, the court had already ruled on the amount of the homestead exemption.

1



previously denied confirmation of an earlier plan.   Throughout
the case, creditor Western Fleet Auto Brokers, Inc. ("Western
Fleet") has objected to plan confirmation.   Prior to the hearing
on November 9th, the court entered a minute order which outlined
the issues to be considered at the hearing.   Those issues are (1)
is the plan feasible; (2) does the plan meet the chapter 7
liquidation test; and (3) was the plan filed in good faith, and
should the court rule that the case was filed in good faith based
on developments in the case since the hearing in April 2006 on
plan confirmation after which the court declined to find that the
case had been filed in bad faith.

The evidence considered by the court includes the testimony
of Robert Rathburn both at the hearing on November 9th and at a
hearing on September 6th, Charles Rigsbee, Roger Dhillon, Mike
Dowdy, and Don Soper, Jr.   Exhibits offered by Western Fleet were
admitted including the reporter's transcript of the April 13,
2006 evidentiary hearing regarding Motion to Confirm Plan. The
court took judicial notice of all schedules and statements of
affairs filed by the debtors in the case.   The court also
considered the testimony of Shirley Rathburn at the September 6,
2006 hearing.[2]

---

[2]The court had commenced a hearing on confirmation of the
debtors' second amended plan on September 6, 2006.   However,
because Western Fleet had filed an objection to the debtors'
claim of homestead exemption immediately before that hearing, it
was impossible to proceed on that date.   Therefore, the
confirmation hearing was continued.   Prior to the continued
hearing on confirmation of the second amended plan, the debtors
filed a third amended plan and stipulated to the lower amount of
homestead exemption.

2

<u>The Basic Issues.</u>

Shirley Rathburn formerly worked as a bookkeeper for Western Fleet.  Western Fleet fired her after it discovered, as it alleges, that she had embezzled funds from its trust account. Western Fleet not only fired Shirley Rathburn, it also filed a civil action against her in state court and criminal charges against her are pending.  In response to the civil action, the Rathburns filed chapter 13.  Western Fleet has objected to confirmation of all the Rathburns' chapter 13 plans on the basis of lack of feasibility, lack of good faith, and failure to meet the chapter 7 liquidation test.

In particular, Western Fleet asserts that the debtors' sworn statements about their income and their liabilities have fluctuated throughout the chapter 13 case and, therefore, that their case cannot have been filed in good faith.  Some items, such as gifts to their children, were not disclosed until a year after the case was filed.  Additionally, Western Fleet asserts that the plan is not feasible because the Rathburns' income is not sufficiently stable to maintain the payments.  The plan depends on a "balloon" payment in month 24.  In order to make the balloon payment, the Rathburns would have to sell or refinance their house.  Western Fleet argues that they will not be able to refinance the house in order to obtain the funds required to make the balloon payment.  Finally, Western Fleet says that in a chapter 7 case, the creditors would get more than they will under this plan.

The Rathburns, in contrast, argue that they are doing their best to pay their creditors in their chapter 13 case.  Mr.

3

1  Rathburn has taken on additional jobs, although he is retired, in
2  order to make the payments.  Mrs. Rathburn is babysitting for
3  their grandchildren in order to assist in making the payments.
4  They assert that any inconsistencies in their bankruptcy
5  schedules and statement of affairs are the result simply of
6  inadvertence and misunderstanding.  They ask the court to confirm
7  their third amended plan.

8  <u>The Third Amended Plan.</u>

9       The third amended plan filed September 13, 2006, lists Class
10  1 creditors paid through the plan.  The only class 1 creditor is
11  Wells Fargo Bank, which holds both the first and second deeds of
12  trust on the debtors' residence.  The plan shows two creditors in
13  Class 4.  Those are Capital One Auto Finance with a regular
14  payment of $420.89 and Washington Mutual Bank with a regular
15  payment of $774.15.  These are secured claims being paid directly
16  by the debtor.  The third amended plan shows Class 5 claims for
17  the Franchise Tax Board and the Internal Revenue Service of
18  $3,146 and $15,704 respectively.  It also shows a Class 6 claim
19  which is Bank of America Auto Finance, which is believed to be
20  zero.

21       Holders of general unsecured claims are in Class 7, and the
22  plan provides that they will receive a 42% dividend.  The plan
23  estimates that holders of general unsecured claims amount to
24  about $206,000.  Bank of America Auto Finance is also shown as an
25  executory contract with a regular payment of $552.76.

26       The plan states that payments will be made as follows:

27       $750 per month for four months
         $1,200 per month for two months
28       $1,400 per month for 54 months

4

$75,000 lump sum payment in month 24

## The Schedules and Statements Filed Prior to Third Amended Plan.

### Bankruptcy petition and schedules of assets and liabilities and statement of affairs filed with the bankruptcy petition.

Schedule B shows, among other things, jewelry in the amount of $700.  Schedule B also shows that the debtors own two cars, a 1986 Toyota Tercel and a 1999 Toyota Four Runner.

Schedule D shows Washington Mutual Bank holding the first deed of trust on the residence; Wells Fargo Financial holding the second deed of trust on the residence; and an equity line of credit from Wells Fargo Bank also secured by the residence.  No priority claims are shown.  Schedule G shows an obligation under an executory contract to Bank of America Auto Finance for a lease of a 2005 Toyota Avalon that the debtors intend to assume.

Schedule I shows income from Mr. Rathburn in the amount of $862 social security and $1,657 pension, as well as a $42 per month prorated tax refund.  It shows that Mrs. Rathburn's only income is $517 per month in social security.  Thus, it shows a combined monthly income of $3,078.

Schedule J shows a car payment of $443 per month.  The car is not identified.  The debtors signed the schedules and statements under penalty of perjury.  No gifts are disclosed at item 7 of the Statement of Financial Affairs.

### The February 9, 2006 Amendment to Schedules I and J.

In the Schedule I filed February 9, 2006, the Rathburns added income of $1,000 per month for Mrs. Rathburn for babysitting.  Schedule J shows increased expenses in

5

miscellaneous categories in an amount overall that increases the
monthly expenses by about $550.  The total amount that can be
paid into the plan goes from $750 in the original schedules to
$1,200 in the Schedule I and J filed February 9th.

### The May 8, 2006 Schedule I and J.

For the first time in May 2006, the debtors amended Schedule
E to show taxes owing to the Franchise Tax Board and the Internal
Revenue Service for years 2003, 2004, and 2005, in a total amount
of $18,850.

Schedule I is amended to reflect that Mr. Rathburn had
obtained employment with Hertz and had a net monthly take home
pay of $792.91.  For the first time, Schedule J reflects a lease
payment for the 2005 Toyota Avalon in the amount of $452.76.
Very modest additional increases to the debtors' Schedule J,
combined with the lease payments on the Avalon and Mr. Rathburn's
employment, result in $1,400 available to pay into the plan.

### Schedules I and J Filed October 24, 2006.

Now, Mrs. Rathburn's babysitting income is reduced by $274
for a car payment, leaving her with a net babysitting income of
$776 per month.  There are miscellaneous increases shown on
Schedule J.  However, both car payments that were shown on the
Schedule J filed May 8th have been removed.  The total amount to
be paid into the plan monthly remains at $1,400 per month.

### Schedule C.

When the debtors originally filed their bankruptcy case,
they asserted an exemption in their residence with a value of
$150,000. However, on September 13, 2006, in response to Western
Fleet's objection, they reduced it to $125,000.

1    Statement of Financial Affairs.

2        When the debtors filed their bankruptcy case, they disclosed

3    no gifts in their Statement of Financial Affairs.  However, on

4    September 5, 2006, they amended item 7 to describe gifts and

5    charitable contributions made within the one year of filing the

6    case.  New item 7 reflects charitable donations in the amount of

7    $2,600 and gifts to family members in the amount of $24,318.56.

8    The Value of the Residence and the Homestead Exemption.

9        At the hearing on confirmation in April 2006, the court

10   found that the value of the debtors' residence is $300,000.

11   Thus, that is the value that is established for the purposes of

12   confirmation of the debtors' third amended plan.

13       The debtors initially claimed a homestead exemption of

14   $150,000.  However, Bankruptcy Code § 522(q) limits a homestead

15   exemption to $125,000 in certain circumstances.  Western Fleet

16   has asserted, in its objection to the debtors' claim of homestead

17   exemption, that those circumstances exist here.  In response, the

18   debtors amended their homestead exemption to $125,000 and have

19   filed a waiver of any claimed exemption beyond that.  At the

20   hearing on October 30, 2006, the court found that for the

21   purposes of this chapter 13 case, the debtors' claim of homestead

22   exemption is limited to $125,000.  Therefore, that fact has been

23   established.

24   Standards for Confirmation.

25       In order for the debtors' chapter 13 plan to be confirmed,

26   the debtors have the burden of proof that the plan is feasible,

27   that is, that they will be able to make the payments required

28   under the plan; that the plan meets the chapter 7 liquidation

7

1  test, that is, that creditors will receive as much under the plan
2  as they would in a chapter 7 liquidation; and that the plan has
3  been filed in good faith.  For the reasons set forth below, the
4  court finds and concludes that the plan is not feasible and that
5  the plan has not been filed in good faith.  It is not necessary,
6  thus, to reach the question of whether the plan meets the chapter
7  7 liquidation test, although the court thinks it is more likely
8  than not that the plan does.

9  <u>Feasibility.</u>

10       The debtors have not met their burden of proof that it is
11  more likely than not that they will be able to make the payments
12  required under the plan.  The debtors' income and expenses have
13  been a moving target during this chapter 13 case.  Part of that
14  is understandable.  Both Mr. Rathburn and Mrs. Rathburn obtained
15  employment during the course of the chapter 13 case and it was
16  therefore necessary to amend Schedule I to reflect that
17  employment.  Unexplained discrepancies in the various amendments
18  to Schedule J will be discussed when the court addresses the good
19  faith issue.  However, for the purposes of feasibility, with the
20  income that the debtors have now, they show on the Schedule J
21  filed October 24, 2006, that they will be able to pay $1,400 per
22  month into the plan.  And, indeed, the plan provides that for 54
23  months the debtors will pay $1,400 per month into the plan.  Mr.
24  Rathburn has testified that he has the ability to obtain other
25  jobs through which he will earn $400 to $800 per month.

26       Even assuming that the debtors are able to continue with
27  their employment (and they are presently in their late sixties),
28  there remains the question of the balloon payment in month 24 of

the plan.  The plan provides that in the 24ᵗʰ month, the debtors
will make a payment of $75,000 into the plan but they will
continue to pay $1,400 per month into the plan so that the plan
extends for 60 months.  Mr. Rathburn testified that he thinks he
will be able to refinance the house based on conversations that
he has had about it.  He further testified that he has
substantially improved the house recently.

Mike Dowdy testified that he is a broker with Access
Mortgage.  He has been a broker since 1976.  He has over 18 years
experience in mortgage lending.  Without objection, the court
qualified him to testify as an expert in mortgage lending.
Presented with a question about whether the Rathburns would
likely be able to borrow enough money on their residence to cover
the existing encumbrances and obtain an additional $75,000, he
opined that it was extremely unlikely they would be able to do
so.  The existing encumbrances total almost $86,000.  Adding the
$75,000 required by the plan, the Rathburns would need a loan in
the amount of about $161,000.  Additionally, the cost of
obtaining the loan would be about 6% of the loan, thus, the loan
would have to be between $174,000 and $177,000.  Mr. Dowdy
described that there are various categories of lenders and that
lenders categorized as "C" and "D" lenders lend to people who
present an extraordinary risk.  According to Mr. Dowdy, the
Rathburns would only be likely to be able to obtain a loan from a
"D" lender.  He contacted 20 lenders and only one "D minus"
lender would make such a loan.  That loan would be at a fixed
rate of 12.99% with 6% costs.  The monthly payment would be
$1,935 per month plus taxes and insurance.

9

The point was made that this is not a situation in which the loan would "buy out" the Rathburns from their bankruptcy. Rather, after the loan is made, they would continue to be subject to bankruptcy court jurisdiction.  According to Mr. Dowdy, lenders do not want to make loans to chapter 13 debtors who have not completed their plans and are still subject to bankruptcy court jurisdiction.

The Third Amended Plan provides that Washington Mutual Bank is paid $774.15 outside the plan directly by the debtors.  According to Mr. Dowdy, with a new loan, this payment would increase to $1,935.  Additionally, the $775 per month payment the Rathburns are making now includes real estate taxes and property insurance.  Under the new loan, real estate taxes and property insurance would be an additional payment, according to Mr. Dowdy. Thus, the debtors would need to demonstrate to the court that in month 24 of the plan, they would not only be able to obtain this new loan, but also that they could make the increased payments, which would increase their mortgage payment by about $1,200 per month and also pay the taxes and insurance.  There was no testimony or evidence about what the taxes and insurance are on a monthly or yearly basis.  However, the court is not persuaded that the debtors have met their burden of proof that they could make the additional $1,200 per month mortgage payment.  Mr. Rathburn was 69 years old when he testified in November.  He thinks he can obtain other jobs in which he would earn $400 to $800 per month.  Even if this is correct, he still would not have the ability to make the additional mortgage payment that the loan would require.

1   Further, the court is not persuaded that the Rathburns have
2   met their burden of proof that they could obtain this loan.   Mr.
3   Dowdy's testimony was persuasive.   Of all the lenders he
4   contacted, only one would even consider it.   The Rathburns'
5   employment history is shaky.   Since the case was filed, they have
6   obtained employment to supplement their social security and
7   retirement.   However, that employment is a very new thing.

8       Thus, the court finds and concludes that the plan is not
9   feasible.

10  <u>Good Faith.</u>

11      In order to confirm a chapter 13 plan, the debtors must
12  prove that the plan was filed in good faith and that the case was
13  filed and prosecuted in good faith.   "Good faith is not
14  statutorily defined.   Instead, a court must make a factual
15  determination of whether a plan has been proposed in good faith
16  based on a totality of the circumstances. [citations omitted]
17  [B]ankruptcy courts should determine a debtor's good faith on a
18  case-by-case basis, taking into account the particular features
19  of each chapter 13 plan."   <u>In re Padilla</u>, 213 B.R. 349, 352 (9th
20  Cir. BAP 1997).   Among the factors that a court should consider
21  in determining whether a plan has been filed in good faith are
22  the debtor's employment history, ability to earn and likelihood
23  of future increases; the accuracy of the plan's statements of the
24  debts, expenses and percentage of repayment and whether any
25  inaccuracies are an attempt to mislead the court; the type of
26  debt sought to be discharged and whether any such debt is
27  nondischargeable in chapter 7; and the motivation and sincerity
28

11

1  of the debtor in seeking chapter 13 relief.[3]

2      The debtors' employment history and ability to earn has been

3  discussed above.  The debtors here appear to have a limited

4  ability to earn and it is unlikely that they will obtain future

5  increases in income.  This factor does not make the plan filed in

6  bad faith.

7      An important factor is the accuracy of the statements in the

8  debtors' schedules of assets and liabilities and statement of

9  affairs of the debtors' debts and expenses.  Here, the debtors

10 have consistently failed to explain to the court their expenses.

11 The original schedules of assets showed that the debtors owned

12 two cars and that they made car payments in the amount of $443

13 per month.  Although the Toyota Avalon lease was disclosed at

14 Schedule G, no amount for the lease payments was put in the

15 debtors' statement of expenses.  Then when the debtors filed

16 their third Schedules I and J in May 2006, the car payment

17 changed from $443 to $420.89 and for the first time, the Avalon

18 lease payment of $452.76 was reflected.  When the debtors filed

19 their fourth Schedules I and J in October 2006, neither car

20 payment was shown.  However, Schedule I reflected that Mrs.

21 Rathburn was making a $274 car payment.

22      In the meantime, the Third Amended Plan filed September 13,

23 2006, still shows a $420.89 car payment to be paid directly to

24 Capital One Auto Finance.  There is no explanation for this

25 ──────────────

26      [3]These factors were first identified by the Ninth Circuit
   Bankruptcy Appellate Panel in In re Warren, 89 B.R. 87, 93 (9th
27 Cir. BAP 1988).  They were reiterated by the Bankruptcy Appellate
   Panel, supra.  There are eleven "Warren" factors.  However, the
28 court is addressing only those that appear to be relevant.

discrepancy.  Mr. Rathburn did testify that at some point (July 2006) their daughter-in-law bought out the lease of the Avalon. The Rathburns, during their chapter 13 case, transferred the residual interest in the Avalon to their daughter for the amount owed on the lease.  Don Soper, Jr. testified that the Avalon had a surplus value over the residual value.  The surplus value of the Avalon was between $4,000 and $7,000.  Mr. Soper has extensive experience as a car salesman and auto broker and was qualified to testify as an expert regarding the value of the Avalon.  The debtors never sought bankruptcy court approval to transfer this property.  And, the transfer resulted in a benefit to the transferee, who obtained the Avalon for less than its value.

The situation with respect to the other car is also not clear.  The first three Schedules I and J showed a payment for another car.  The last one does not.  Mr. Rathburn testified that their daughter had always made the car payments on this other car.  However, Schedule J filed in October 2005, February 2006, and May 2006, all show the car payments as an expense, even though their daughter was paying for it.  None of this explains why that car payment is still reflected in the plan.

Perhaps the most significant problem is the gifts.  No gifts to relatives were disclosed in the initial filing.  It was not until September 5, 2006, that the Rathburns finally disclosed the over $24,000 of gifts that had been made to relatives prior to the case being filed.  In the context of this case, that is a particularly significant deficiency.  Mr. Rathburn testified that he did not realize that these gifts had to be disclosed.  Over a

13

1 period of time his memory brought it back to him.   The court
2 finds this testimony not credible.

3      An additional problem is Mrs. Rathburn's criminal law
4 attorney.   Mr. Rathburn testified initially that in November
5 2006, they paid this attorney, one Mr. Richardson, a $1,000
6 retainer in two payments of $500 each.   The total that they are
7 obligated to pay through trial is $5,000.   After his memory was
8 refreshed, he realized that the payments had been made prior to
9 the bankruptcy case being filed.   In the meantime, the Rathburns
10 are paying him about $100 per month or whatever they can afford.
11 These payments are not shown in any of the schedules that the
12 Rathburns filed.   Additionally, the attorney is not reflected as
13 a creditor.

14      Thus, the debtors made a payment to an attorney either
15 immediately before or immediately after they filed their
16 bankruptcy case.   They are paying that attorney on a regular
17 basis since they filed the bankruptcy case, and these payments
18 are not provided for in the plan or disclosed in the schedules.

19      Under all these circumstances, the court is unable to
20 conclude that the case has been filed in good faith.   There is
21 not any one act by the Rathburns during their chapter 13 case
22 that leads the court to this conclusion.   Rather, it is the
23 cumulative effect of the failures to disclose, especially with
24 respect to the gifts and the payments to the state court
25 attorney, and the multiple changes and the moving target
26 presented by the debtors' expenses, as well as the sale of the
27 excess equity in the Avalon and the failure to disclose it, or to
28 obtain court approval for it.   All these facts and circumstances

14

lead the court to conclude that the plan was not filed in good faith, and based on the facts that have to come to light since the initial hearing on the chapter 13 plan, the court also finds and concludes that the case was not filed in good faith.

For these reasons, it is not necessary to reach the question of whether the plan meets the chapter 7 liquidation test.   Even if it did, the plan cannot be confirmed.

As set forth above, the debtors' homestead exemption is limited to $125,000.   To that extent, the objection to the homestead exemption is sustained.

A separate order will issue.

DATED: November 28, 2006.

WHITNEY RIMEL, Judge
United States Bankruptcy Court

15

PROOF OF SERVICE BY MAIL

STATE OF CALIFORNIA )
                    ) ss.
COUNTY OF FRESNO    )

I am a citizen of the United States and a resident of the county aforesaid; I am over the age of eighteen years and not a party to the within above-entitled action; my business address is 2656 U.S. Courthouse, 1130 O Street, Fresno, California, 93721. On November 28, 2006, I served the within document on the interested parties in said action by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at Fresno, California, addressed as follows:

Peter B. Bunting, Esq.
2501 W. Shaw Ave., #119
Fresno, CA 93711

Jeff Reich, Esq.
8441 N. Millbrook, #104
Fresno, CA 93720

M. Nelson Enmark, Esq.
Chapter 13 Trustee
3447 W. Shaw Ave.
Fresno, CA 93711

I certify (or declare), under penalty of perjury, that the foregoing is true and correct. Executed on November 28, 2006, at Fresno, California.

Kathy Torres, PLS

16